## *In re* QUONG WOO.

(*U. S. Circuit Court, District of California—Habeas Corpus—July, 1882.*)

CONSTITUTIONAL LAW—SAN FRANCISCO "LAUNDRY ORDINANCE." An ordinance of the city of San Francisco regulated, by a system of licenses, the business of laundries within specified limits, under penalties for misdemeanor: *Held*, that the ordinance was void; that where licenses are merely a means of prohibiting any of the vocations of life (not injurious to public morals, health, etc.), they cannot be upheld.

In May, 1882, an ordinance was passed by the board of supervisors of San Francisco, to take effect in June following, to regulate the business of laundries. In the first section, the ordinance declares, that, after its passage, it shall be unlawful for any person "to establish, maintain, or carry on any laundry within that portion of San Francisco lying and being east of Ninth and Larkin streets, without having first obtained the consent of the board of supervisors, which shall only be granted upon the recommendation of not less than twelve citizens and tax-payers in the block in which the laundry is proposed to be established, maintained or carried on." The second section declared, that the license collector shall not issue a license to any person, or persons, proposing to establish, maintain or carry on a laundry within the limits mentioned, unless he, she or they shall first have obtained from the board of supervisors their written consent thereto, based upon the recommendation of citizens and tax-payers, as provided in the first section. The third section makes the violation of these provisions a misdemeanor, upon conviction of which the party

may be punished by a fine not exceeding $1,000, or by imprisonment not exceeding six months, or by both. The petitioner is a Chinaman, held under a warrant for violating the ordinance.

FIELD, J., in delivering the opinion of the Court, said:

The question presented is, the validity of the ordinance in requiring for the issue of a license to "establish, maintain or carry on" a laundry within the limits mentioned, the recommendation of twelve citizens and tax-payers in the block in which the laundry is to be "established, maintained or carried on." The ordinance in terms covers all laundries, whether used for the separate wants of a family or for the washing of clothes of others for hire. We shall assume, however, that it has reference only to laundries of the latter class. It is directed equally against those who establish them, those who maintain them, and those who carry them on. If the recommendation of any parties in the block can be required as a condition of granting the license for either of these purposes, the number is a matter of discretion with the supervisors. They may require the recommendation of double or treble the number designated; they may exact the unanimous recommendation of the citizens and tax-payers of the block. Nor need they confine the recommendation required to citizens and tax-payers; any other class may be equally designated. They may require it of some of our worthy resident aliens from Europe—gentlemen of Irish or German nativity. Indeed, if they can make the exercise of their legislative power in the granting of licenses dependent upon the approval of anybody else, they may place the approval with whomsoever they may deem best, and no one can control their action.

They have the power, by the act of April 25, 1863, "to prohibit, and suppress, or exclude from certain limits, or to regulate, all occupations, houses, places, pastimes, amusements, exhibitions and practices which are against good morals, contrary to public order and decency, or dangerous to the public safety." But the business of a laundry—that is, the washing of clothing and cloths of various kinds, and ironing or pressing them to a condition to be used—is not of itself against good

morals, or contrary to public order or decency. It is not offensive to the senses, or disturbing to the neighborhood where conducted, nor is it dangerous to the public safety or health. It would be absurd to affirm that it is. If it be conducted in a manner that is offensive or dangerous, the supervisors may direct the manner to be changed, and prescribe regulations for its prosecution. If the building in which it is carried on is, by its structure, form or material, unsafe, the supervisors may, by proper proceedings, have it altered or removed. This power the supervisors possess with reference to all avocations, and the buildings in which they are prosecuted. All business must be so conducted as not to endanger the public safety and health. Here we are concerned only with the business of a laundry by itself; the manner or the buildings in which it is conducted are not before us. The ordinance applies as well to a laundry in a fire-proof building as to one in a wooden shanty. In the business of a laundry by itself, there is nothing objectionable that may not be urged against all occupations in the city and county. If, therefore, the supervisors can make its prosecution depend upon the approval of others in its neighborhood, they may require a similar approval for the prosecution of other business equally inoffensive. They may require members of the bar to close their offices against professional business unless they can secure the recommendation in their behalf of such parties in the block where the offices are, as may be designated. So, too, with bankers, merchants, traders, mechanics, journalists, publishers, printers—indeed, with all brain workers and hand workers—the pursuit of their avocations in particular localities may be made to depend not upon their wishes, their means, the position of their property, the facilities afforded for their business, but upon the favor or caprice of others, whose actions they cannot control by any legal proceedings. A party might not even be able to obtain a license to carry on business on his own land, provided he should possess an entire block, and it should not be occupied by others who could give the recommendation exacted. Such a restriction upon the freedom of pursuit of a lawful occupation is not authorized by any power vested in the board of supervisors; and it may be doubted whether it could be au-

thorized by any legislative body under our form of government.

The supervisors are, it is true, empowered by the act of March 3, 1872, to "license and regulate all such callings, trades and employments, as the public good may require to be licensed and regulated, and as are not prohibited by law," but their power cannot be delegated by them to others, or its exercise made dependent upon others' consent. The power of legislation vested in them is a public trust, which can only be executed in consonance with the general purposes of the municipality, and in subornation to the general laws and policy of the State. Their ordinances must be reasonable—that is, not oppressive, nor unequal, nor unjust in their operation, or they will not be upheld. Such is the well established doctrine with respect to the legislation of municipal bodies. In *ex parte Frank*, it was applied by the Supreme Court of California to an ordinance passed by the supervisors, under the act in question, exacting a license for selling goods, and fixing a different rate where the goods were within the corporate limits or *in transitu* to the city, and where the goods were without the city and not *in transitu* to it. The ordinance was held to be unjust, oppressive, unequal and partial, and, for these reasons, as well as because it was in restraint of trade between the city and the interior of the State, was adjudged to be void. The decision of the Court was accompanied by some very just observations upon the limitations to the exercise of legislative power in the passage of ordinances by municipal bodies. 52 Cal., 606.

Licenses for callings, trades and employments may be required by the supervisors where the nature of the business demands special knowledge or qualifications on the part of the party, as in the case of dealers in drugs. They may also be required as a means of raising revenue for municipal purposes. But in neither case can they be required as a means of prohibiting any of the avocations of life which are not injurious to public morals, nor offensive to the senses, nor dangerous to the public health and safety. Nor can conditions be annexed to their issue which would tend to such a prohibition. The exaction, for any such purpose, of a license to pursue an avocation of this nature, or making its issue dependent upon con-

ditions having such a tendency, would be an abuse of authority. Such is evidently the tendency and purpose of the conditions required in the ordinance in question in this case, and we have no doubt of its invalidity for that cause.

*Prisoner discharged.*